(Slip Opinion)

# Retaining Private Counsel to Represent the DHS Secretary in Impeachment Processes

The Department of Homeland Security may retain private counsel to assist the Department in representing itself and the Secretary in impeachment proceedings aimed at decisions or actions within the scope of the Secretary's official duties and unaccompanied by any allegations of personal misconduct.

January 4, 2023

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
DEPARTMENT OF HOMELAND SECURITY

You have asked whether the Department of Homeland Security ("DHS") may contract with and pay for private counsel to assist DHS in "[r]epresenting the Department's interests and advising Department officials" in impeachment proceedings. Memorandum for Neil Kinkopf, Senior Counselor, Office of Legal Counsel, from Neal Swartz, Associate General Counsel for General Law, DHS, *Re: Retaining Private Counsel for a Federal Official Subject to Impeachment Processes* at 1 (Oct. 27, 2022) ("DHS Memo"). You have asked this question at a time when there is no impeachment inquiry pending in the House, so there is no concrete situation to focus our analysis. This is significant because a complete analysis would depend on the facts and circumstances of an actual proceeding.

We are aware, however, of House Resolution 582, introduced in the 117th Congress on August 10, 2021, entitled, "Impeaching Alejandro Nicholas Mayorkas, Secretary of Homeland Security, for high crimes and misdemeanors." House Resolution 582 contains two articles of impeachment, each including a number of specific charges. Article I alleges that the Secretary failed to maintain border security, while Article II alleges that the Secretary placed departmental personnel and American citizens at risk of COVID-19 by failing to prevent potentially contagious noncitizens from entering the country. The Resolution is critical of policy decisions made by the Secretary and accuses him of neglecting his constitutional and statutory duties. Our understanding is that all of the Secretary's decisions described in the two articles were made within the scope of his office and implemented administration policy. Critically, there are no allegations of personal misconduct, such as treason or bribery. If the

House initiates an impeachment inquiry against Secretary Mayorkas in the 118th Congress, we assume that House Resolution 582 would be a reasonable approximation of its contents. To the extent necessary, this response to your question proceeds on that assumption, and our advice is limited to the circumstances presented by an impeachment inquiry that lacks any allegations of personal misconduct.

You have further informed us that in your judgment, DHS lacks the capacity to represent itself and the Secretary in impeachment proceedings and that DHS has the statutory authority and the appropriations necessary to retain private counsel. Under these circumstances, we conclude that DHS may contract with and pay for private counsel to assist DHS in representing itself and the Secretary in such proceedings.

## I.

An agency has the authority to retain and pay for private counsel for representation in impeachment proceedings when three conditions are met. *See Authority of the Department of Health and Human Services to Pay for Private Counsel to Represent an Employee Before Congressional Committees*, 41 Op. O.L.C. __, at *1, *5 (2017) ("*Authority of HHS to Pay for Private Counsel*"); *see also* Memorandum for the Deputy Attorney General from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel, *Re: Reimbursement of Anne M. Burford for Private Counsel Fees* at 2 (May 3, 1983) ("*Burford I*") ("[W]e are aware of no legal restrictions that would completely preclude the retention of a private law firm by an agency to represent the agency, its employees, or its former employees in connection with a Congressional inquiry into the conduct and administration of the agency."). "First, representation of the agency by agency counsel . . . must be inappropriate or impermissible. Second, representation by private counsel must be in the government's interest, and the government may not pay fees incurred in representing the purely personal interests of the employee. Third, the agency must have the organic statutory authority and an available appropriation to retain and pay for private counsel." *Authority of HHS to Pay for Private Counsel* at *5.

Although we formulated this test in the context of individual-capacity representation of a federal employee whose testimony was subpoenaed in an oversight investigation, *id.* at *1, the same test applies generally to an

agency's retention of private counsel for official-capacity representation in an impeachment proceeding. We derived the three conditions from the "'basic rule'" that "'a general appropriation may be used to pay any expense that is necessary or incident to the achievement of the underlying objectives for which the appropriation was made.'" *Id.* at \*5 (quoting *Indemnification of Department of Justice Employees*, 10 Op. O.L.C. 6, 8 (1986)). An agency has considerable discretion to determine whether expenditures further the agency's authorized purposes. *Id.* at \*6. "'If the agency believes that the expenditure bears a logical relationship to the objectives of the general appropriation, and will make a direct contribution to the agency's mission, the appropriation may be used.'" *Id.* (quoting *Indemnification of Department of Justice Employees*, 10 Op. O.L.C. at 8). "In the context of retention of private counsel, this Office has concluded that the 'logical relationship' standard may be met when the representation is in the government's interest, the employee is being questioned about conduct performed within the scope of her employment, and agency counsel is not available." *Id.* at \*7. These fundamental principles of appropriations law apply equally to an agency's expenditure of appropriated funds to retain private counsel for official-capacity representation in an impeachment proceeding.[1]

---

[1] We agree with DHS that there is no obstacle presented here by 5 U.S.C. § 3106, which prohibits agencies from hiring attorneys for the conduct of litigation and requires agencies to refer such matters to the Department of Justice. We have previously concluded that "litigation" in section 3106 refers only to judicial proceedings and does not include administrative adjudications. Memorandum for Stuart M. Gerson, Assistant Attorney General, Civil Division, from David G. Leitch, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Engagement of Private Counsel to Represent Employees in Connection with Investigations by the Office of Special Counsel and Proceedings Before the Merit Systems Protection Board* at 3–8 (Sept. 18, 1992). Applying the same reasoning, we have concluded that congressional oversight proceedings are not litigation: "[t]he exclusive authority and prerogatives of the Attorney General over matters in litigation are not generally read to extend to non-litigation matters such as congressional inquiries." *Burford I* at 1 n.1; *see also Authority of HHS to Pay for Private Counsel* at \*3 & n.3. Notwithstanding the fact that the Constitution borrows terms of a judicial nature to describe impeachment proceedings, *see, e.g.*, *In re Comm. on the Judiciary, U.S. House of Representatives*, 951 F.3d 589, 596 (D.C. Cir. 2020), *vacated and remanded sub nom. Dep't of Just. v. House Comm. on the Judiciary*, 142 S. Ct. 46 (2021), we conclude that the term "litigation" in section 3106 is best read not to include impeachment proceedings. We do not believe that Congress intended to assign the Department of Justice with exclusive representational authority in impeachment proceed-

We understand that at this point, DHS has contemplated the potential scope of work for private counsel only in general terms. DHS has informed us that the role of private counsel "may involve": advocacy to persuade House members not to support instituting impeachment proceedings; representing DHS's interests and advising DHS officials on congressional processes related to an impeachment inquiry, including responding to subpoenas for DHS documents, information, and the testimony of DHS officials; representing individual DHS officials if they testify and DHS attorneys are not permitted to participate; and representation of DHS and the Secretary should there be a Senate impeachment trial. DHS Memo at 1. We proceed to apply the three-part test to these arrangements as generally described to us, in the context of an impeachment proceeding that lacks allegations of personal misconduct, like House Resolution 582.

## A.

The first of the three conditions is whether representation by agency counsel would be inappropriate or impermissible. In the matters in which we have previously found authorization for funding of private counsel, agency counsel was unavailable because of a congressional rule prohibiting the presence of agency counsel or because a congressional committee demanded that agency counsel not attend. *Authority of HHS to Pay for Private Counsel* at *2; *Reimbursing Justice Department Employees for Fees Incurred in Using Private Counsel Representation at Congressional Depositions*, 14 Op. O.L.C. 132, 133 (1990); *Representation of White House Employees*, 4B Op. O.L.C. 748, 750 (1980).

We have not previously considered what other circumstances may justify payment for private counsel on the basis that representation by agency counsel is inappropriate, impermissible, or otherwise unavailable. In requesting our advice, you have suggested that DHS counsel would not be available because "DHS does not have sufficient expertise in impeach-

---

ings given the political nature of the impeachment process, which takes place in a political forum with a political remedy. Moreover, the Department has not provided formal representation in any of the five impeachment trials of Executive Branch officers. The foregoing analysis does not foreclose formal or informal participation by Department attorneys in impeachment proceedings. For example, consultation with the Office of Legal Counsel may be appropriate or necessary. Department attorneys also may be available as an alternative or supplement to agency counsel or retained private counsel.

ment matters in-house." DHS Memo at 1. In a subsequent oral conversation, you further explained to us that DHS also lacks the necessary staff resources. We offer no view on the sufficiency of available DHS legal resources, but we agree that these reasons, where they are present, would justify hiring outside counsel. *See Burford I* at 1–2 ("Agencies most often provide . . . this representation through their own general counsels, but, on occasion, they do exercise their contracting authority to retain private counsel to assist them in providing legal services that are beyond the expertise or resources of agency counsel."). The core of the inquiry is the logical relationship between the expenditure and achievement of the agency's objectives. Where an agency lacks in-house capacity, there is a close nexus between the expenditure to retain outside counsel and achievement of the agency's objectives. We encourage DHS nonetheless to consider the extent to which DHS's experience with congressional relations may carry over to the impeachment context. The scope of representation of the private firm should be commensurate with the rationale justifying the representation. DHS has experience managing DHS documents and evaluating government privileges in the oversight context, and it may therefore be appropriate for DHS counsel to also handle such matters, in whole or in part, in the impeachment context. Similarly, DHS should consider whether its experience with interviews, depositions, and hearings in the oversight context may make it appropriate for DHS counsel to handle such matters, in whole or in part, in the impeachment context.

## B.

The second of the three conditions is that private counsel representation meets the agency's interests. We have previously explained that this condition is based on the principle that "general appropriations are available to pay for private counsel only when doing so is necessary to the furtherance of government interests; they are not available to pay for representation of purely private interests." *Authority of HHS to Pay for Private Counsel* at *9.

An impeachment proceeding implicates the personal interests of the impeachment subject, much more so than the extent to which a congressional oversight proceeding implicates the personal interests of a federal official. An impeachment inquiry is by definition aimed at determining

whether a specific officer should be accused of "Treason, Bribery or other high Crimes and Misdemeanors"—and if so, should be tried by the Senate. U.S. Const. art. 2, § 4. Conviction by the Senate would remove the officer and carries the additional possible penalty of "disqualification to hold and enjoy any Office of honor, Trust or Profit under the United States." *Id.* art. 1, § 3. The impeachment subject's interest in avoiding these personal consequences is weightier than, and are in addition to, the personal interests that are implicated in other types of congressional proceedings, such as "being treated fairly, having a full and fair opportunity to respond, and avoiding being made an unfair target of congressional criticism." *Reimbursing Justice Department Employees*, 14 Op. O.L.C. at 137.

At the same time, the presence of personal interests "does not automatically preempt a legitimate governmental interest"; "the two may exist side-by-side." Government Accountability Office, *Principles of Federal Appropriations Law* 3-116 (4th ed. 2017) ("*Federal Appropriations Law*"); *see also Authority of HHS to Pay for Private Counsel* at *9–10; *Representation of White House Employees*, 4B Op. O.L.C. at 753. In impeachment proceedings that challenge the lawfulness of official actions, such as House Resolution 582, both the official and the government have a significant interest in defending the lawfulness of those actions; to that extent, the two sets of interests are highly congruent.

There are various important government equities that come into play whenever official government conduct comes under question. We have not previously analyzed those government interests in the impeachment context, but we have done so in analogous contexts. One such context is congressional oversight. *Authority of HHS to Pay for Private Counsel* at *3; *see also Representation of White House Employees*, 4B Op. O.L.C. at 754. Another involves the testimony of former government officials under subpoena in federal criminal proceedings. Memorandum for Dick Thornburgh, Attorney General, and Stuart E. Schiffer, Acting Assistant Attorney General, Civil Division, from William P. Barr, Assistant Attorney General, Office of Legal Counsel, *Re: Reimbursement of Attorney Fees for Private Counsel Representing Former Government Officials in Federal Criminal Proceedings* at 1 (Oct. 18, 1989) ("*Reimbursement for Private Counsel*"). In each of those contexts, we have identified significant government interests that may justify government representation of executive officials. We have also noted that "[a]bsent compelling facts to the contra-

ry, it is normally presumed to be in the interest of the United States to provide representation for employees sued (or subpoenaed) for acts performed within the scope of their employment." *Burford I* at 4 n.4; *see also Authority of HHS to Pay for Private Counsel* at \*13.

The government has a significant interest in defending the lawfulness of official policies and procedures. *Representation of White House Employees*, 4B Op. O.L.C. at 753; *Department of Justice Authority to Represent the Secretary of Housing and Urban Development in Certain Potential Suits*, 31 Op. O.L.C. 212, 215 (2007) ("*DOJ Authority to Represent HUD*"); *Department of Justice Representation in Federal Criminal Proceedings*, 6 Op. O.L.C. 153, 153–54 (1982). To the extent that impeachment is understood as one of the key checks and balances between the branches of government, the Executive Branch has a significant interest in defending the legality of its policies in this interbranch process.

The government also has an interest in relieving employees from any burdens that arise from their good faith performance of official duties. *See Authority of HHS to Pay for Private Counsel* at \*13; *see also id.* at \*14 (explaining government interest in providing representation to employees who are "'caught in a power struggle between Congress and the executive branch'" for "'simply, and properly, doing their jobs'" (quoting *Reimbursement for Private Counsel* at 18)). Failing to provide representation could have a chilling effect on federal employees in carrying out their official duties. As the Attorney General explained long ago: "No man of common prudence would enter the public service if he knew that the performance of his duty would render him liable to be plagued to death with lawsuits, which he must carry on at his own expense." 9 Op. Att'y Gen. 51, 52 (1857); *see also* 9 Op. Att'y Gen. 146, 148 (1858) ("When a[n] . . . executive officer is sued for an act done in the lawful discharge of his duty, the government which employed him is bound, in conscience and honor, to stand between him and the consequences.").

We have also suggested that the "interest in the development of judicial precedent involving litigation against federal employees" may be a significant government interest, "even where, in the particular case, the government lacks an interest in vindicating the employee's conduct or avoiding deterrence of similar conduct." *Reimbursement for Private Counsel* at 10 n.12; *see also DOJ Authority to Represent HUD*, 31 Op. O.L.C. at 215 n.2. Although an impeachment inquiry does not directly involve litigation,

the historical practices of Congress and the Executive Branch can be influential on future decisions of either branch. The Executive Branch has an important interest in how those practices develop. Significant inter-branch dynamics come into play whenever Congress attempts to use impeachment as a device to remove executive officials, since impeachment is a key mechanism in the constitutional separation of powers. *Cf. In re Lindsey*, 158 F.3d 1263, 1282 n.16 (D.C. Cir. 1998). Moreover, given the rarity of impeachment, especially of Executive Branch officials, precedent is underdeveloped in this area. Shaping the development of precedent on the numerous impeachment-related legal issues that could arise may be an important interest.

Finally, significant Executive Branch confidentiality and other institutional interests may arise when Congress seeks documents and information from an agency during an impeachment proceeding. *Representation of White House Employees*, 4B Op. O.L.C. at 753; *Reimbursement for Private Counsel* at 18; *Attempted Exclusion of Agency Counsel from Congressional Depositions of Agency Employees*, 43 Op. O.L.C. __, at *2, *8–11 (2019); *see also Exclusion of Agency Counsel from Congressional Depositions in the Impeachment Context*, 43 Op. O.L.C. __, at *3 (2019) (recognizing that executive privilege is available in impeachment proceedings). Where an impeachment inquiry is based on official conduct, Congress will inevitably seek documents and information that implicate those confidentiality and institutional interests. Additionally, there is a government interest in the correct and clear presentation of information. *Representation of White House Employees*, 4B Op. O.L.C. at 753; *Attempted Exclusion of Agency Counsel from Congressional Depositions of Agency Employees* at *2; Memorandum for J. Paul McGrath, Assistant Attorney General, Civil Division, from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel, *Re: Reimbursing Norman Edward Perkins for Attorney's Fees* at 4 (Mar. 15, 1982).

There may, however, be limits to DHS's and the Executive Branch's interests. First, in a situation where the conduct at issue in the impeachment proceedings is outside the scope of the office, the agency's interests would not necessarily be served by defending the impeachment proceedings. *See Burford I* at 4 n.4. Although the agency may still have an interest in such proceedings—for instance, an interest in having the official nonetheless continue in office or an interest in the way that the law of

impeachment is developed—the existence of such an interest must be determined on a case-by-case basis.

There may also be circumstances in which these governmental interests diverge from the impeachment subject's interests. Although the government generally has an interest in defending official conduct against an outside challenge, that interest does not necessarily hold where the federal government brings a criminal prosecution of the same conduct. At that point, the "interests of the United States have been defined by the prosecuting authority to be adverse to those of the defendant." *Department of Justice Representation in Federal Criminal Proceedings*, 6 Op. O.L.C. at 154. The same may be true where the official, based on the same conduct underlying the impeachment proceedings, has potential civil liability to the government or is the subject of adverse action by the federal agency. *Authority of HHS to Pay for Private Counsel* at \*16; *In re Securities and Exchange Commission—Reimbursement of Legal Expenses Incident to Internal Investigation*, 58 Comp. Gen. 613, 618 (1979).

In the circumstances as described to us and set forth in this opinion, we conclude that the significant personal interests at stake generally do not preclude the presence of legitimate government interests that can justify paying for representation of the Secretary. Where impeachment is aimed at the Secretary's official policy decisions and there are no allegations of personal misconduct, the Secretary's personal interest in defending the lawfulness of his actions will overlap with the government's interests. In these circumstances, we have not identified any personal interests that are inconsistent with the government's interests. Thus, the Secretary will not in such situations be said to have any "purely personal" interests that might preclude payment for his representation. *Authority of HHS to Pay for Private Counsel* at \*16. This determination, however, should be considered in the context of any specific proposed representation and revisited on an ongoing basis as the facts continue to become available.

Your inquiry also indicates that "the contracted firm may need to represent individual DHS officials if they are required to provide testimony and the Congressional Committee does not allow DHS attorneys to participate in the oversight process." DHS Memo at 1. Under those circumstances, the contracted firm would not be participating as counsel for the agency; the representation would establish an attorney-client relationship between the employee and the contracted firm, whereas the official-capacity repre-

sentation of DHS and the Secretary in the impeachment inquiry would establish an attorney-client relationship between the contracted firm and DHS. *Authority of HHS to Pay for Private Counsel* at *4–5 & n.5. An agency's authority to pay for private counsel for individual employees must meet certain conditions. *See generally id.* A fact-specific determination would be required to assess whether it is in the government's interests to pay for private counsel, as well as whether it would be appropriate or permissible for the same contracted firm to represent the agency and an individual employee in her individual capacity. As long as the interests of the individual and the agency remain aligned, such that there would not be any conflict of interest, "nothing about the attorney-client relationship between the private counsel and the employee prevents private counsel from working with agency counsel to understand the agency's positions" about the inquiry and the confidentiality interests of the agency. *Id.* at *15. In those circumstances, payment for representation of private counsel for such individuals might reasonably be assessed to further the government's interests, so that it would be appropriate for DHS to pay for the representation of individuals. Again, though, this determination must be made on the facts of any specific proposed representation as they arise.

## C.

The third and final condition is that the agency has statutory authority to retain private counsel and an available appropriation with which to pay. This condition, as above, must be considered separately for each agency in the factual context of each situation. As potential sources of authority and appropriations, DHS has identified 5 U.S.C. § 3109, 6 U.S.C. § 392, and section 505 of the DHS Appropriations Act, 2004, Pub. L. No. 108-90, 117 Stat. 1137, 1153 (Oct. 1, 2003).[2]

Under 5 U.S.C. § 3109(b), agencies "may procure by contract the temporary . . . or intermittent services of experts or consultants or an organization thereof" if that procurement is "authorized by an appropriation or other statute." Section 3109 does not itself provide the substantive authority to obtain expert or consultant services. *Authority of HHS to Pay for Private Counsel* at *17. That is because section 3109 requires additional

---

[2] We have not attempted to identify other sources of statutory authority or appropriations that may be available to DHS.

authorization "by an appropriation or other statute." *See Federal Appropriations Law* at 3-28 (4th ed. 2017).

DHS finds that additional authorization in 6 U.S.C. § 392(1). Section 392(1) provides that the Secretary of DHS "may procure the temporary or intermittent services of experts or consultants (or organizations thereof) in accordance with section 3109 of title 5." DHS has also informed us that it has available appropriations under section 505 of the DHS Appropriations Act, 2004, which provides that "[i]n fiscal year 2004 and thereafter, unless otherwise provided, funds may be used for . . . services authorized by section 3109 of title 5, United States Code." Pub. L. No. 108-90, 117 Stat. at 1153.

We agree that these provisions grant DHS the necessary statutory authority and appropriations. We previously found the necessary authority for the Department of Health and Human Services to retain and pay for private counsel in an appropriations provision that cited 5 U.S.C. § 3109 and a general appropriation for salaries and expenditures. *Authority of HHS to Pay for Private Counsel* at *18–19. The cited DHS provisions similarly satisfy the requirements.

DHS's authority under those provisions, however, is subject to the limitations associated with 5 U.S.C. § 3109. First, Office of Personnel Management regulations implementing the provision, *see* 5 U.S.C. § 3109(d), provide that section 3109 authority may be used "only where agency employees are not able to perform the function for which the expert is retained." *Authority of HHS to Pay for Private Counsel* at *17 n.14 (citing 5 C.F.R. § 304.103(b)(3)–(5)); *see also Use of White House Funds for Payment of Consultants to Assist Presidential Nominee to Regulatory Agency at Confirmation Hearing*, 2 Op. O.L.C. 376, 377 (1977) ("Section 3109 would thus appear to encompass the employment of outside counsel to assist the nominee if, in your judgment, this would provide expert or professional services not available within the White House Office."); *Employment of Temporary or Intermittent Attorneys and Investigators*, 3 Op. O.L.C. 78, 78 (1979) ("[I]n our view, this appropriation may not be used to hire employees to perform the same functions as are performed by regular employees in your Office.").[3]

---

[3] This limitation overlaps with the first condition in the test that our Office has described to determine whether the government may fund private counsel representation:

The second potential limitation depends on the scope of the contract. Section 3109 has been understood to authorize contracting for either "personal" or "nonpersonal" services. 1 *Federal Appropriations Law* at 5-25 to 5-26 (3d ed. 2004) (citing *Method of Procurement Concerning the Propriety of Paying Al Fleming*, B-174226 (Comp. Gen. Mar. 13, 1972)); *see also* Jeffrey Lovitky, *The Problems of Government Contracting for Consulting Services*, 14 Pub. Cont. L.J. 332, 334 (1984); *Comptroller Gen. Warren to the Comm'r, United States Section, Int'l Boundary & Water Comm'n, U.S. & Mexico*, 27 Comp. Gen. 695, 695 (1948) (discussing section 15 of the Administrative Expense Statute of August 2, 1946, the predecessor to 5 U.S.C. § 3109). A personal services contract "is characterized by the employer-employee relationship it creates between the Government and the contractor's personnel."[4] 48 C.F.R. § 37.104(a). In contrast, a nonpersonal services contract is akin to an independent contractor relationship. *See id.* § 37.101.[5]

---

that representation by agency counsel would be inappropriate, impermissible, or otherwise unavailable. *See supra* Part I.A.

[4] The Federal Acquisition Regulation, 48 C.F.R. § 37.104(d), identifies factors to assess whether a service contract is personal or nonpersonal:

(1) Performance on site.

(2) Principal tools and equipment furnished by the Government.

(3) Services are applied directly to the integral effort of agencies or an organizational subpart in furtherance of assigned function or mission.

(4) Comparable services, meeting comparable needs, are performed in the same or similar agencies using civil service personnel.

(5) The need for the type of service provided can reasonably be expected to last beyond 1 year.

(6) The inherent nature of the service, or the manner in which it is provided, reasonably requires directly or indirectly, Government direction or supervision of contractor employees in order to-

(i) Adequately protect the Government's interest;

(ii) Retain control of the function involved; or

(iii) Retain full personal responsibility for the function supported in a duly authorized Federal officer or employee.

[5] Although section 3109 has been understood to authorize nonpersonal services contracts with independent contractors, it is possible that an agency could enter such a contract without a specific statutory grant of contracting authority. *See* 48 C.F.R. § 37.102(d) ("Non-personal service contracts are proper under general contracting authority.").

The difference between a personal and nonpersonal service contract is significant because the Comptroller General has consistently determined that for personal services contracts—but not for nonpersonal contracts—section 3109(b) limits the contract rate to the daily equivalent of the highest GS scale.[6] *The Honorable Jack Brooks*, B-210518 (Comp. Gen. Jan. 8, 1984); *U.S. Advisory Comm'n on Pub. Dipl.*, 61 Comp. Gen. 69, 77 (1981); *In re Charles R. Hobbs Corporation* at 2–3, B-191865 (Comp. Gen. Nov. 13, 1978); *Comptroller Gen. Warren to the Adm'r, War Assets Admin.*, 26 Comp. Gen. 188, 189 (1946). The point of this distinction is to ensure that this authority is not used to evade the highly reticulated scheme governing and limiting the pay of federal employees. Without this distinction, section 3109 could be used to pay individuals who function as federal employees a salary in excess of the approved federal scale.

Whether DHS's hiring of private counsel would be a personal or nonpersonal service contract would depend on the scope and terms of the contract. We agree with DHS that, on the one hand, contracting a law firm to provide an independent second legal opinion for advisory purposes would be a nonpersonal service. DHS Memo at 5; *U.S. Advisory Comm'n on Pub. Dipl.*, 61 Comp. Gen. at 74. On the other hand, certain factors identified by the Federal Acquisition Regulation might point the other way when contracting private counsel to provide direct representation under close supervision. *See supra* note 4. We believe that private counsel might take significant responsibility in impeachment defense and still be considered an independent contractor. In *In re Legal Services of a Retired Annuitant*, the Comptroller General considered a proposed contract with a retired government attorney to continue an investigation and administrative proceedings that he started prior to retirement. 53 Comp. Gen. 702, 703–04 (1974). The tasks under contract included assisting the managing counsel in the actual conduct of cross-examination at an administrative

---

[6] The decisions of the Comptroller General are not binding on the Executive Branch because the Comptroller General is an agent of Congress. *See Comptroller General's Authority to Relieve Disbursing and Certifying Officials from Liability*, 15 Op. O.L.C. 80, 82–83 (1991); *Bowsher v. Synar*, 478 U.S. 714, 727–32 (1986). We do, however, consider Comptroller General opinions to be "useful sources on appropriations matters." *Authority of the Environmental Protection Agency to Hold Employees Liable for Negligent Loss, Damage, or Destruction of Government Personal Property*, 32 Op. O.L.C. 79, 85 n.5 (2008).

proceeding, preparing recommendations as to the exhibits to be offered, and preparing proposed rebuttal testimony. *Id.* at 704. The Comptroller General concluded that "an attorney having such experience. . . who already has closely participated throughout the entire course of the investigation, would be capable of performing all tasks and services specified in the contract without the close and continuous supervision or direction that would tend to nullify his independence as a contractor." *Id.* at 707. Extending that logic, the contract might be structured in a way that private impeachment counsel receives significant direction from DHS but not in such a close and continuous way that it would create an employer-employee relationship. After all, a number of the factors in 48 C.F.R. § 37.104(d) could support the characterization of a contract as one for nonpersonal services. We assume that the contract would not be performed on-site at DHS's premises, during DHS-determined work hours, or using DHS-furnished tools or equipment. The services also would be related to a single proceeding that is limited in time and not within DHS's usual functions. Although the contract would require a certain level of supervision by DHS, it would also call for private counsel to exercise a significant degree of professional judgment, much in the way that private clients often retain outside counsel without exercising the type of supervision akin to that of an employer over an employee. Should an impeachment inquiry of the kind you describe occur or seem imminent and DHS decide to pursue the option of retaining private counsel for the activities you describe, this issue will need to be considered in the context of the specific facts presented.[7]

---

[7] This memorandum does not address the question of what level of control the agency is required to maintain over private counsel. We consider this question to be too fact-specific to answer in the abstract.

In a similar vein, this memorandum does not address whether a contract between DHS and private counsel would be subject to competitive contracting procedures. As a general matter, an agency that conducts a procurement for property or services must "obtain full and open competition through the use of competitive procedures in accordance with the requirements of this division and the Federal Acquisition Regulation." 41 U.S.C. § 3301(a)(1); *see also id.* § 3304(a) (allowing use of noncompetitive contracting procedures when certain circumstances are present). We leave it to DHS to consider the contracting procedures that DHS would use.

## II.

We conclude that DHS may contract with and pay for private counsel to assist DHS in representing itself and the Secretary in an impeachment proceeding aimed at decisions or actions within the scope of the Secretary's official duties and unaccompanied by any allegations of personal misconduct.

CHRISTOPHER H. SCHROEDER
*Assistant Attorney General*
*Office of Legal Counsel*